All right, we are now ready to hear argument in the case of J.K.J. et al. against Polk County. Mr. Cranley. May it please the Court. Good morning, Your Honors. To prove municipal liability under Monell, plaintiffs had to prove their injuries were caused by the culpable action and deliberate actions of Polk County itself, and not merely by the criminal conduct of Daryl Christensen. On municipal culpability, a central question is notice, which in this case, a case like this, can be shown in one of two ways, either through a pattern of prior similar constitutional violations or under the Canton single incident exception. Plaintiffs here have conceded there was no pattern and no reasonable jury could conclude that they proved single incident liability on the part of evidence of sporadic and undefined tear talk and one prior incident of a former guard inappropriately touching an inmate over her clothes were sufficient to put the county on notice that sexual assault of inmates was likely to occur. So as you present your argument, Mr. Cranley, I think it'll be helpful to keep the standard of review in mind. Obviously, this jury did conclude that there was enough circumstantial evidence to infer that Polk County did not have a serious policy against the type of abuse that occurred here as a matter of fact. I mean, obviously, there are words on a paper, but we have lots of cases that say that's evidence of a policy, but not conclusive. Well, what this court is here to do is to look at the evidence and determine whether a reasonable jury could reach the verdict that it did, whether it's a question of the sufficiency of the evidence. The actual jury verdict really should not inform this court's opinion. The same standard under Rule 50B for a post-verdict motion applies in prior to verdict under a directed verdict motion under Rule 50A where you don't have the benefit of what the point being, though, that our job is not to re-weigh evidence. It's to look at the evidence and see whether any jury could have derived from that evidence the finding that Polk County had an insufficient policy, a deliberately indifferent policy to the safety of inmates. Correct, but the decision that the jury gets to make is guided by the case law. Cases like Canton and Connick and Monell, obviously, and under that law, the evidence that the plaintiffs rely upon, these dissimilar prior incidents, is insufficient. They were found to be dissimilar as a matter of law and in any event could not have made it so obvious to the county policy makers that jail staff were likely to sexually assault inmates. So you don't think the jury could find from all of the evidence that the danger was obvious? No, not the danger of sexual assault. Really? I thought that was widely recognized or at least the jury heard evidence that was widely recognized in professional correctional circles and that even Mr. Nargis acknowledged there's at least a risk. Yes, as a general matter, there is a risk of notice to the county. The question is not just notice of a particular incident, is it? Because the plaintiff's expert, as I recall, acknowledged at trial that the defendant county was responsive once it learned about Christensen's assaults over several years, correct? That's correct. Said you had a pretty good record, right? Yes, over 14,000 inmates. In responsiveness. But the testimony was also that there was in essence a complete failure to address the other prongs of effective policies to address this risk, namely prevention and detection. Why wasn't that testimony, along with the combination of the failure to detect and address Christensen's hundreds of assaults over several years, a reasonable basis to infer deliberate indifference? You're referring to Mr. Iser's testimony based on PREA, that there were certain aspects of PREA that should have been incorporated. Not just PREA, but just general recognition of the risk. I'm not interested in the legal or constitutional status of PREA, but in the factual risk and the county's to prevent and detect. It's undisputed that the county had a comprehensive system of policies. I wouldn't agree with that. I think it's undisputed that there was a written policy. What is not undisputed, and the jury found as a fact against you, was that the written policy actually constituted the policy. In fact, the policy, as Judge Hamilton is saying, a jury could find, didn't have aspects of prevention and detection in it. So, a person such as Christensen or any other kind of person could act with impunity. What the plaintiffs are really arguing is that there were omissions from the policy. They believe that certain aspects of PREA, for example, should have been incorporated. And Wisconsin law, and there are all sorts of other things. It's not just PREA. I don't want to get off on a rabbit hole down PREA because it's some evidence. But as Judge Scudder put it in his dissenting opinion at the panel level, they were aware of a problem. They had to do something. And he said the one option that was not available was doing nothing. Well, first of all, when we're talking about omissions and policies, this court and the pattern of prior unconstitutional... I'm not sure that that's right. Well, you don't have to have a pattern, right? A pattern, correct. In Calhoun... No, you don't have to have a pattern. It can be possible to establish. I mean, there has to be notice. But the single incident theory, the premise is there wouldn't necessarily be a pattern, right? That's correct. But this case doesn't fit the single incident theory. If they were on notice, right? Jorgensen's behavior put the county on notice that there was a problem with prevention and detection, and that in this kind of tinderbox situation where you have male guards supervising a captive audience of female inmates, they were on notice that the policy itself was not restraining or preventing sexual misconduct. The plaintiffs were required here to present evidence that the county made a conscious choice to take some action or to not take some action. And why isn't, for example, the conscious decision not to take the training materials that the state of Wisconsin was offering them a piece of that evidence? We're not going to train people. We're not going to get your PowerPoints. We're not going to get your assistance in training our people for prevention again. Nobody says that we had to change Christensen's mind. Let's assume he's incorrigible. But deliberately chose not to do things. Every county, every municipality can't have every policy under the sun, as the court said. No one is saying that. But this jury heard that this county decided not to do anything other than write some words down in the book. Well, that's not correct. All of these jailers received extensive training, not only in the policies, which are much broader. But the testimony was conflicting about that. And what testimony supports that they received extensive training on sexual assaults? They did receive extensive training about other things. But who testified, other than the written policy itself, that they were trained on sexual assaults and how to prevent or detect them? I wouldn't discount the fact that they were trained on all of the policies, first of all, which covered a wide range of activity. But what testimony, viewed in the light most favorable to the plaintiffs here, would support that other than the written policy on no sexual contact with inmates, that they received any other kind of training here? And in particular, any training on preventing or detecting sexual assault? They received training on sexual assault, on reporting sexual assault. Judge Haney is asking you to be specific, because your opponents say that although there was lots of training, it was on other things. It was not on sexual assault. Who testified? If you could please identify where in the record there's testimony from someone that they received any kind of training on preventing or detecting sexual assault? I know there's testimony about the written policy. I know there's testimony that the handbook itself had the policy in there. But where, please, in the record, is there any testimony that would support that they received training on preventing or detecting sexual assaults, or anything beyond the actual written policy? They were trained, for example, about appropriate interactions with inmates. Testified. Who testified to that? Sergeant Schaefer. Again, if I could please, who testified to that in the context of sexual assault? And Sergeant Schaefer did testify about some sexual assault training, but it was with respect to co-workers, not with respect to inmates. Well, first of all, sexual assault is a little bit different than some of the things that the cases have looked at under Canton, the Canton exception. I understand that, but I'm trying to find out what's in the record, if you would. I'm trying to find out what evidence. You made the statement a moment ago in response to a question that they received, that the guards here received a lot of training about sexual assault. And I'm trying to find out where in the record that was, because I looked and went through the record, and I didn't see that. Again, I wouldn't discount the fact that they received training on all the policies, and to suggest that that means that certain words were just read to them, I don't think is a reasonable conclusion. But we're not drawing inferences in your favor here. You're asking us now to draw an inference in your favor, and there's a jury verdict in favor of the plaintiffs. That's not what we do. I would point out, too, that they did receive PREA training. First of all, the county changed its policies, as we've talked about, in 2012 to enact certain provisions of PREA. They received the PREA training in 2014, and the real argument here by the plaintiffs is that they wish they had been given certain other PREA training. There's one session where they received PREA training, and the plaintiff's expert testified about that, and he testified why that wasn't sufficient. And again, the fact that the policy was changed, it still had nothing about detecting or preventing sexual assault. How do you get around that? Because that is an example of the plaintiff's or the plaintiff's expert arguing for more specialized training that has been rejected by courts like Connick. But we're in a jury verdict situation. How can we reject, if we're looking at the evidence in the light most favorable to the plaintiffs, who the jury found for, how can we reject favorable evidence to them that their expert gave? Aren't you asking us to weigh the evidence, which is something we can't do at this stage? No. The question is the sufficiency of the evidence. And if we're talking about, as we must— But when you say sufficiency, you don't mean on balance. You have to mean whether the bare minimum to reach the jury was achieved here. Let's just be clear. Correct. But again, we're— the prevention and detection is disturbing because you haven't cited yet the evidence. You're giving us general answers, but you're not giving us the specifics that Judge St. Eve is looking for. Mr. Cranley, can I also ask you to tell me whether you recall this testimony from Schaefer? Question. Now, with regard to sexual harassment of inmates, did Captain Nargis at any time after the discovery of the behavior of Alan Jorgensen institute a sexual harassment training program for jail employees or sexual harassment against inmates? Answer, no. I recall that testimony. But the— first of all, the sexual harassment training was given countywide, but— So why couldn't the jury credit that? Are you telling us what the jury should have believed and what it should not have believed? What the Canton exception requires, which is the world we're living in here, this very narrow and rare set of circumstances where Canton applies, is it asks the question of whether, by the nature of the officer's duties, they are going to be put in positions where they need to make judgments. And the county is aware because it's obvious that they'll need to make those judgments. And if they don't have any training to make those judgments, that constitutional violations are very likely to occur. And in this case, it can't be said that if, by the very nature of a jail officer's duties, if they're not given training, they're going to sexually assault people. And in this case, they were given training. And this isn't a question about the nuances. It's not a conic situation where— Mr. Cranley, the jury here was instructed that they could find notice, and there was no objection to this particular instruction, that they could find notice if the risk and inadequacy of the training, supervision, and or adoption of policies was plainly obvious. And we have the testimony, again from the expert, about the inadequacy or lack of training, incomplete lack of training, on anything pertaining to detection and prevention and complete lack of training with respect to the inmate's ability to confidentiality report. So I think your characterization of Cannon is going beyond what the jury was instructed on and what the law and the circuit provides and what you did not object to. Well, the argument then is that they received training, some training. No, the argument is, and which is why we've been asking you this morning, they received no training beyond the written policy. They received no training on preventing or detecting sexual assaults. And if there is some evidence, and I'll let you speak in a moment, sorry. If there is some evidence on that, if you could please identify who testified to that type of training. Again, there are a number of cases from other circuits— I'm not talking about cases, I'm talking about the record here, please. Could you identify who testified that the officers received any kind of training on sexual assault other than the written policy itself and the one session in, I think it was 2012, about Korea? Well, they were trained that sexual assault is not tolerated, it's not tolerated under Polk County policy, and it's a felony under Wisconsin law. They received the training— Mr. Cranley, this is Judge Rovner. Couldn't a jury have determined that the relative slap on the wrist to Jorgensen, along with the tacit approval of unprofessional conduct with the tolerance that's teared off and the superficial PREA training indicated that Polk County prohibited sexual misconduct officially but was not committed to enforcing it in reality? Again, there are a number of cases that address situations in which there were prior events like what occurred with Mr. Jorgensen that were much more closely related to the actual constitutional violations. Cases like Vigo County, Han V. Walsh— Vigo County is quite different from this case. That was a decade, different people, different situations. It really has no bearing on this case. Well, in Vigo County, there were multiple prior incidents of sexual misconduct. No, no, no, no, no. Not from the county's point of view. There, over a very long period of time, had been a couple of unrelated incidents and the county was not, therefore, on notice. Here, we've talked about three or four different pieces of circumstantial evidence that would have permitted a jury to find that this county was on notice of the risk of sexual misbehavior. Actually, one of them is the existence of all these laws that say, don't do this. The existence of studies, the expert testimony, the county's decision to turn a blind eye to all of the training that was offered. I don't say a jury had to find this at all. I think a jury easily could have ruled for you, but I think it was a jury question. Mr. Cranley, on this issue of notice, the Jorgensen circumstance, that happened in 2012, correct? That's correct. The sexual assault started in 2011, is that correct? That's correct. When the NS complaint about Jorgensen occurred, the jail interviewed everybody on the cell block, correct? Yes. They interviewed NS and they interviewed Jorgensen, correct? Yes. They did this analysis, including Sergeant Moe, and they ultimately decided to reprimand, correct? That's correct. Then NS recants the recantation and they restart the investigation, correct? Yes. And it's at that circumstance that that's the first time that the allegation, the factual allegation about the touching comes up in that second investigation, correct? Yes. And I'd like to point out, too, what the real evidence was that the jury had to review with respect to the NS incident. That letter from NS was not admitted for substantive purposes. It was hearsay and the jury was instructed that it couldn't conclude that anything that she claimed in that letter actually happened. But it was admitted for notice. It was admitted to establish or as evidence of what the county knew at the time. What was alleged and what the county considered in its investigation and what it considered was conflicting evidence, credibility issues. When the judge admitted it, there was a colloquy about it being admitted, again, not for the truth of the matter, because you're right, it was hearsay, but being admitted to show knowledge or notice what the county was informed of at the time, which is an exception to hearsay. Correct, but not to conclude that those things actually happened. And what they were told or what they were on notice of. Correct, and they considered that, they evaluated it, and they reached a decision in their discretion based on the conflicting testimony and the credibility, their assessment of the credibility, and they issued discipline. The whole suggestion here that the Jorgensen... You say they issued discipline and they did issue a letter, but didn't they also tell Jorgensen when they issued that letter, don't worry about this, this isn't going to hurt your career? No, well... There was testimony... The term was, it's no big deal, you can overcome this. Couldn't a jury reasonably infer that's not going to hurt your career here? Drawing it in the favor of the plaintiff? Or that the county thought it was no big deal. Yeah, let me ask you, Mr. Cranley, whether... I have the letter right here. It's Exhibit 31, you know it. This is N.S.'s letter to Nargis, Captain Nargis, about the Jorgensen conduct. Suppose I went outside the courthouse right now and I asked the first few people I saw on the sidewalk to read the first three pages of the letter, but I didn't give them page four. If they read pages one through three, here's the kind of stuff they would read, and I don't think it's in keeping with the characterization that you offered at the outset. He's been inappropriate in a sexual manner toward me. It's continuing through my incarceration now. I didn't tell the truth because he's told me to keep quiet. He always makes comments about seeing me in the shower, calling it a nice show. He's told me he wants me to ride topless in his boat. He wants me to lift my shirt. Going on, he recently has started touching me. He shoved me and he pushes me. And very recently, while bringing me back from a visit, he grabbed me around the waist and then he slapped my butt, et cetera, et cetera. Many times he's looked down over the cart to look down at my shirt. Don't you think if I, what do you think the few people on the sidewalk would say if I said, now predict what's on page four of that letter. Don't you think each of them would say that in light of that escalation, in light of that grooming, that what's on page four got worse? It's probably disastrous. And if that's the way people would read that letter, why couldn't a jury view the letter as putting the county on notice, on notice of the obvious and highly predictable outcome that an inmate's going to get sexually assaulted? Well, again, as I started to say before, the suggestion that there was a culture that permitted sexual assault or sexual impropriety. Why couldn't a jury have reached the conclusion that I just asked you about? Because that is a far distance from the trauma experienced by the plaintiffs in this case. And again, that's not evidence. The Chief Deputy Moe made it clear that there was conflicting evidence, there were credibility issues. Didn't Chief Deputy Moe also testify that after they received this letter from the inmate, that they thought it was probably true that he had done this? They found her credible? He said it was probably true that some touching occurred. But he also said with his 30 or 40 years of experience that he didn't believe that they considered pressing criminal charges, but didn't believe there was sufficient evidence. And based on the conflicting evidence that they had, they issued this reprimand. And on this big deal comment, they also say there are serious consequences involved and allegations amounting to a crime could have arisen, correct? Pardon me? That's what they tell him as part of the reprimand. Absolutely. And the point I've been trying to make too is that no one at the jail was under any illusions that the county was going to turn its blind eye to sexual misconduct. Not only was Jorgensen reprimanded and after that- Why aren't you describing your argument to the jury as opposed to the compelled conclusion from this record? I'm not sure what you mean, but we're- No, I mean, you would have argued to the jury, I'm sure you did, exactly what you just said, that nobody could have looked at this Jorgensen history and thought that the county was going to tolerate sexual misconduct, certainly of the extreme form that occurred here. But why isn't that just an inference for the jury to make? There is rather serious misconduct  and very little happens to Jorgensen. Well, except that he resigns under investigation when his co-workers say, yeah, I've heard him say some improper things. This is the system working at Fulton County. Things getting reported, investigated, and under that pressure, he resigned. The other point, though, that's important- But didn't he resign after he said something inappropriate to a co-worker as opposed to an inmate? So it wasn't the inmate incident that caused him to resign, or at least the jury could so decide. The jury could think, well, that was just, oh, you know, we're going to slap you on the wrist. And then the co-worker incident finally pushes him out the door. Well, my point is that no one in that jail thought that this kind of behavior was going to be tolerated, least of all Christiansen. Isn't there evidence on the other side, though? I'm sure you deeply believe that, but I think there's evidence on the other side. Well, we've been talking about notice, but from a causation standpoint, it's clear that Christiansen knew full well because he said, don't tell anybody, because if I get caught, I'm- That, of course, I understand that you make that argument, but that's why we were talking about prevention and detection, because the question isn't whether there was anything that was going to deter a man like Christiansen who thought he had the opportunity from acting. But if the jail had had policies that proactively tried to detect and deter, maybe he would have thought twice, not because he was a good guy, but because there are cameras in the room, or doors are open, or other measures are taken. At the end of the time that I'd like to reserve, but let me point out, too, that even Mr. Iser testified that there is no empirical or scientific evidence or even any study that any of the best practices that he recommended would have had any effect on this case or even in general, whether they improved impacts. How about just having guards go work in pairs when they work in opposite-sex parts of the jail? Well, as Mr. Iser pointed out, all of those provisions of PREA aren't necessarily applicable or appropriate, especially in a small county jail in a rural county in Wisconsin. They don't necessarily have the ability to have that kind of staffing, and Iser even said that. He said they should all do the best they can do. And this county made the common decision to have the kind of staffing they have. This is the best the county could do. Three years of sexual assaults by Christiansen undetected. Well, with respect to what you talked about in terms of supervision, of guards-on-guards supervision, but if I could be... I have one question before you sit down. What qualifications are necessary to become a correctional officer in Wisconsin? Are there any? Pardon me? Are there any? They have to complete the certification training, 160 hours on a number of topics that are outlined in, I believe it's Exhibit 4. They have certification annually thereafter, and they go through multiple layers of on-the-job training. Certified and then they can be hired? Pardon me? They're certified that they've completed that training and they're able to be hired then? They can be hired and sent to the training at that point, but they also receive training in the jail. This is state-sponsored, state-mandated, state-approved training, which the state said every year they met the requirements. Thank you. All right. Thank you, Mr. Cranley. Ms. Grady? Thank you, Chief Judge Wood. It may please the court. JKJ and MJJ suffered more than 100 sexual assaults over the course of three years at the Polk County Jail. After hearing all of the evidence in this case and after being properly instructed on the law required to hold municipalities liable, the jury concluded that the county evinced deliberate indifference in its actions and was the moving force behind the plaintiff's sexual assaults. Ms. Grady, are the plaintiffs proceeding here on a failure-to-train theory alone or other theories? The jury was instructed on the failure to train, the failure to have policies, and the failure to supervise, and this court can affirm that judgment on any one of those grounds. So your argument here today is on multiple theories or one theory? The argument here today is that that judgment should be affirmed on any one of those theories. So you go beyond the dissent at the panel level, which just dissented with regard to the failure to train theory of liability, correct? I believe that the evidence supported a verdict that Polk County acted with deliberate indifference for failing to enact policies and enforce policies that prevented and detected sexual assault. I think that that is sufficient to uphold the jury verdict and the court actually need not agree on precisely what theory, so long as it finds that there is sufficient evidence to uphold the jury's verdict on one of these theories. You mentioned earlier that the jury was correctly instructed. There wasn't an objection, but in fact, the jury was not correctly instructed on cause, correct? The district judge indicated substantial factor causation instead of the moving force causation, correct? I believe that the district court's instruction to the jury was that the failure to provide adequate training, supervision, and or adoption of policies caused the plaintiff's injuries. I recognize as you have mentioned that he goes on to say that cause was a substantial factor in bringing about or actually causing the injury or damage. I think first, that is a correct statement. The fact that the Supreme Court has repeatedly and this court has repeatedly talked about causation by using the words moving force doesn't mean that it has to be the only force. And in fact, this court has recognized in Whitlock that there will often be multiple proximate causes of a constitutional injury. Whitlock is not a substantial, it's not an intentional deliberate indifference case. It's not a Monell case. You cited it on page 15 of your PFR. You cite Whitlock and Scottsdale, but neither of those are Monell cases and neither of those are deliberate indifference cases. We are not in a position to overrule Connick and Bryan County and Monell, which say the moving force. So the district court record 244, page five says caused means the act or omission was a substantial factor. That's not correct. We've got to follow the Supreme Court law on causation, correct? I disagree with that, Your Honor. The Supreme Court and this court has talked about causation in terms of requiring a close connection between the deliberate indifference that's alleged and the harm that's ultimately visited. This court in Glisson and in Woodward has indicated that causation can be met when the deliberate indifference neatly tracks as it does here with the harm that's ultimately visited. And we can talk about, I'm sorry, we can talk about Glisson and Woodward and their distinguishability in other circumstances. I just want to talk about your, the evidence you're pointing to for causation. So page two of your PFR, you list 10 sites from the testimony of JKJ, MJJ, and Iser that are on record 262 and 264. And I checked those sites and none of them mentioned the word cause. None of them mentioned the word causation. None of them list causal elements. So help our court understand how your citation to the causation evidence supports that conclusion. Sure. To address your question directly, I would never expect a plaintiff to be able to talk about the cause of a policy being the cause of their injury. That's the sort of thing that the jury has to take as a whole. Causation is a quintessential fact question that comes from a variety of sources. And it is almost always requires the jury to look at circumstantial evidence in addition to direct evidence of notice and deliberate indifference. The Supreme Court in Canton said that the deficiency has to be closely related. So in our case, what the plaintiffs proved was that the county was deliberately indifferent to the risk of sexual assaults by female detainees against female detainees by male guards. What ended up happening, the injury that was ultimately visited on the female detainees was sexual assault by male guards. Let's talk about those particulars that you're saying. Plaintiff's expert, Jeffrey Iser, when he testified on Wednesday morning of the trial, he didn't link the Nargis tear talk with Christensen's assaults, correct? I don't believe there was direct testimony by Iser that Jorgensen's assault caused Christensen to commit assaults, if that's your question. And the same thing with tear talk. Plaintiff's expert Iser never says tear talk caused JKJ and MJJ to get sexually assaulted, correct? But is that the question, or aren't we looking to see whether the jury had enough evidence to find that there was deliberate indifference and that the county's policies were the source of, the county reflected deliberate indifference in the policies that it chose. And I'm looking to find out- Not just the tear talk. I'm looking to find out that absence of evidence, whether the evidence is truly absent. If Iser doesn't link the inappropriate comments or the Jorgensen situation or the tear talk with Christensen's sexual assaults, then hasn't the plaintiff's expert given away the story? I mean, he's not testified to causation. And then we look at page two of your PFR and there's not that causation evidence. So to address that directly, I don't think that Iser nor any other person would be qualified to testify as an expert on cause. The question of cause is one that we take all of the evidence and we task to the jury to decide, understanding that there's a sufficiency floor, but we task the jury to say, look at all of this evidence, look at the evidence of the county's deliberate indifference, look at the evidence that the county was put on notice that it's predatory behavior, it was tolerating and encouraging. And that the county had no policy with respect to prevention or detection, which opened the door for a person such as Christensen. For all we know, there's somebody else. Christensen's our problem here. But the issue is, did the county reflect deliberate indifference in the policies that it chose? And it chooses not to train on these points, it chooses all sorts of things that lead to a policy of laissez-faire going on in this particular facility. Absolutely, Judge Wood. And to the point of causation, the fact that these sexual assaults were allowed to occur over the course of three years without anybody taking steps to detect them or to prevent them, that itself is probative that the policy, rather than just this individual whose only relationship with the county is employment, was the cause of the plaintiff's injuries. And what about the lack of training on prevention or detection? That was a choice, was it not? Or a jury could conclude that it was a deliberate choice on the part of the county. There was a great deal of evidence about the training, the lack of training, and the fact that the jail inspector who testified at Trial Hump affirmatively made available to Nargis, the county's policymaker, by email training that was from soup to nuts. It was the training, all he had to do was put it on a screen. And that is relevant both to show that it was an actual choice not to train, but also that there was no reason not to do it other than choosing not to provide any training. And in that context, my friend on the other side talked about training as a general matter, but was unable to provide specific citations. And that's because the evidence on this score is almost entirely one-sided. It's great. On that failure to train theory, there's one of two ways it can happen, right? It either is a pattern or a single incident. When we talk about pattern evidence, page 45, footnote 10 of your brief, you waive the pattern, correct? I don't believe that we have waived the pattern. The jury was not instructed on a pattern, but I think there's sufficient evidence of a pattern to affirm on that basis here. Judge Conley, the district judge, February 5th, 2018, page seven of his order says, I'm finding there's not a pattern, correct? Judge Conley expresses some concern about the pattern evidence, and we raise an objection to that. And in fact, repeat that we've made a formal objection. He did not make a Rule 50A finding. He does express concern to be candid, and ultimately does not instruct on that. And let me just be clear as to the legal implications of that. All of the evidence that we believe supports a finding of notice, the Jorgensen incident, the evidence of clear, repeated predatory verbal behavior towards inmates, all of that becomes relevant to the question of whether it was obvious to the county that it's continued inaction and continued choice not to take any further steps, whether that inaction led the risk of sexual assault by male guards against detainees to be obvious. So, Ms. Gray, on this issue, though, of you've laid out a culpability case, and we've heard questions that lay out a culpability case. Culpability evidence is different than causation evidence. That's why I brought you back to page two of the PFR, because the court's got to see causation evidence. And Christensen testified here, and he did not. Opportunity for both direct examination and cross-examination. He didn't say the tear talk caused me to sexually assault. He didn't say the inappropriate comments caused me to sexual assault. He didn't say, I heard about the Jorgensen investigation and that emboldened me to sexually assault. He wasn't even asked the question of the cause, correct? So this gap of a causation evidence is something that we as a court in the appellate court have to grapple with. But is the right causation question whether Christensen personally would have been deterred, or whether the county had created, through its policies, an environment in which sexual assault of inmates was going to happen? I think the right causation question is whether given that county is in action, it was foreseeable that sexual assault would occur. And I think in this case, the evidence supports that standard. I'm sorry. You might want to revise that answer, that you've just stated a negligence standard of fault and causation. And I know there was a negligence claim submitted to the jury, so let's not mix up the two. It's a heightened standard of fault, heightened standard of causation. I absolutely agree with you. Negligence would not be sufficient here. What we were required to show was just said reasonably foreseeable. That's the wrong standard. That's a negligence standard. So what you were saying, though, I mean, I thought we were saying, if the point is, was the county deliberately indifferent to this obvious risk of sexual abuse on the part of guards toward inmates? And if it was, and then that risk materializes, it's just as though a doctor were deliberately indifferent to a medical issue at a prison. You know, the person sitting there with a broken leg and they don't do anything. Well, then maybe it gets infected. You see the causal link from one to the other. So I think the place to be careful about negligence, of course, which you do have to be careful about, is what's the county's both objective and subjective perception of what's going on. Right. And so I don't suggest that a county's negligence could satisfy the culpability standards here. And even if this court finds that the foreseeability must be even more than you would say in a normal section 19. Reckless disregard of unknown or patently obvious substantial risk. Emphasis on all the adjectives. Absolutely. In order to prevail, and the jury was correctly instructed on this, the jury had to determine, which it did, that the county was aware of a substantial risk of harm and that by failing to act, it was the cause, the moving force behind the plaintiff's injuries. And the jury found that. And to address Chief Judge Wood's point, I think that this court has recognized that often evidence that goes to the merits of culpability overlaps heavily with causation. The key in Canton, as the court articulated, was the link between the deliberate indifference that's been articulated and the ultimate injury. And in Canton, after articulating that standard, the Supreme Court cautioned courts that judges and juries doing their respective jobs are up to the task, especially here where causation is such a quintessential fact question. The jury could have found and did find that this abject lack of policies and training and supervision led and was the moving force behind these plaintiff's injuries. And... ...instructed the moving force. Those words, the jury never heard those words. In the Western District of Wisconsin, they show the jury instructions right up on the board in addition to them reading it. And those words never appear in the instruction. This court's jurisprudence has cautioned against picking particular words and has looked to see whether the jury was instructed correctly as a whole. And I think taking the whole of the instructions it was, and to address your earlier question about Christensen not testifying, that in fact, the city's actions caused him to commit these sexual assaults. He also testified that he perpetrated these assaults because while he knew they were illegal, he believed they were consensual. And that's part of the evidence about what we're saying wasn't done here. Ms. Brady, I understood your causation argument to be something broader than whether or not the lack of these policies or lack of training would have deterred Christensen himself. Am I correct at that? That's right. And so if you could articulate exactly what your causation theory is. So what plaintiff did prove and what plaintiff has to prove is that the county is deliberately indifferent to a substantial risk of harm. And Farmer against Brennan, the Supreme Court has guided courts to say that it doesn't matter that this particular person faced a risk because of something individual to him or because all people in that category face a similar risk. In Farmer, it was transgender prisoners. This court in Brown has talked about that in the context of Caucasian prisoners. And the deliberate indifference here was to a risk of sexual assault by male guards against female detainees. This is a small jail. We're talking, I believe, 16 male guards. And what's the causation piece there? If they had failed, if they had trained properly or had the proper policies in place, what's the causation argument? If they had had the proper policies in place, the jury could have found that other inmates or these plaintiffs would have reported. They could have found that other guards would have prevented and detected the sexual assault from occurring. They did not have to find that the county caused Christensen himself as long as their indifference caused the harm in a number of ways. Same question that Judge Sainee was asking Mr. Cranley, though. What's the witness or the exhibit or the transcript reference that talks about that? That's why we review page two of the PFR and it's just not there. Sure. First is the testimony by the investigator. I'm missing his name, unfortunately. The first person who testified testified that the way this all came to light was that a detainee went to a different jail and reported. That's evidence which the jury could infer showed that when you get to one of the many jails where there is a safe reporting mechanism, inmates do report. Detainees do report. There's evidence in the record that when N.S. wrote the letter to Nargis admitting the sexual assault that there were other people who were aware and did not report the sexual assault, which the jury could have found was because there was no mechanism to provide safe reporting. Isn't the jury also hearing, though, from plaintiff's expert, it's Rogersdorf, that Christensen had conditioned J.K.J. into this circumstance of learned helplessness? So let's go back to the Connick case. In Connick, this prosecutor Deegan on his deathbed after nine years reveals that he had taken out Thompson's, he'd taken away the Thompson blood test. He tells another ADA. And that assistant district attorney sits on it for five years. So you've got this lengthy period of time where the evidence is being hidden. The same circumstances here where you've got J.K.J. and MJJ in this coercive circumstance where they cannot reveal. That's the problem we have with regard to causation evidence. We have to see that transcript or that evidence that links the culpability facts that you're talking about with the causation finding. I disagree that our causation argument rests on the plaintiffs reporting Christensen. There's a wealth of evidence in the record that other detainees were in a place where they would have seen this misconduct. And when the misconduct began, it was out in the open flagrantly in front of other jailers. And that's exactly the kind of training we're saying led to these inadequacies. No one's told there could be a reporting mechanism or that there could be a way for these detainees and other guards to hold Christensen accountable. Can I take your point? For example, one of the three areas is these inappropriate comments. The inappropriate comments, whether by J.K.J. or Christensen, but those, the dates and times are not specific and they weren't reported to the county. And that becomes a problem because the county doesn't know about it, right? I disagree with that. I think just taking N.S.'s letter, for example, she sets out a very concrete timeframe from October 2010 to July 2011. Jorgensen made repeated comments in the shower and called it a nice show. And I won't keep the other things that she talked about about the predatory behavior. But that's at Exhibit 31. And in addition to that, Nargis himself testifies that he has been made aware of multiple jailers making sexually explicit comments about female detainees and that he himself participated in that. And the jury was entitled to infer, especially given the context of this small county jail, where, again, there are 16 male guards who work in close proximity to one another, that this was the sort of pervasive thing that was not only tolerated, but condoned by the county. Now, you talk about that being pervasive, but tear talk appears once in this thousand-page transcript, correct? It's only referenced by Nargis, correct? The words tear talk, I didn't do a calculation, but I'll take your word. It just appears a couple times in Nargis's testimony. And the plaintiffs don't talk about it, correct? The plaintiffs do talk about it, Your Honor. The plaintiffs do not use the phrase tear talk as part of their testimony, either on direct or cross-examination. Correct. The same thing with regard to plaintiff's expert witnesses. Explain how the plaintiffs, you're drawing a distinction between using the words tear talk and describing the chatter that goes on, you know, the sexualized chatter. Yes, the plaintiffs testified extensively about multiple sexually explicit comments that had gone on at the jail. So they may not have known the local lingo, but they were talking about it. Right. And if I can put the testimony that uses that phrase tear talk in context, at record 263-53-54, trial counsel asks, you have heard, in fact, heard Mr. Christensen make inappropriate or sexual comments about females. Is that correct? Answer, females in general, yes. Question, and you have also engaged in tear talk, which is not necessarily flattering talk amongst co-workers in the tier. Is that fair to say? Yes. And you have heard Sir Allen, or excuse me, Daryl Christensen comment about an inmate's rear end while you were a supervisor. Answer, I don't recall specifically on him commenting about an inmate's rear end, but it could have happened. And the line of questioning goes on. The context of that testimony, I think more than allows a reasonable jury to infer and conclude that the use of the word tear talk, while maybe not explained by plaintiffs directly, obviously refers to sexually explicit talk about female detainees. But if the questioner in that transcript that you read wanted to use the word sexual or wanted to not connote, but denote that that's what they were talking about, they could have done that because they did that with other witnesses, but they didn't do that with him. Sure. And I don't know whether that was moving quickly or maybe that was in the deposition transcript. I wouldn't necessarily attribute that to anything more than something that happened in the midst of trial. The question is whether it would be unreasonable to infer that this was sexually explicit language and that Nargis was admitting to not only tolerating it, but participating in it. And the reason that we leave these sort of inferences to the jury is because the jury saw Nargis' testimony at this time. They saw his demeanor. They saw counsel's questioning and they were able to take the inference based on all of those things. Ms. Grady, is it correct that District Judge Conley understood the evidence that way? Yes. And to be frank, the defendants in this case really never challenged the connotation of tear talk at any point until the appellate brief. And in the red brief, I don't actually think that they challenge it much either. From my reading, and I wasn't at the trial either, but from my reading, it looked to be pretty well understood what tear talk meant. And while they may not have been mentioned beyond these two pages before the jury, I think the context also and the other, the positioning of the question in between to express questions about sexually explicit discussions would allow the jury to infer that the, infer that the discussions were sexually explicit. Counsel, do you agree that you would have an easier time on causation and a failure to detect and prevent theory than a failure to supervise theory? Because the problem with the failure to supervise theory and causation is that Christensen may well have been incorrigible and no amount of training may have stopped Christian, Christensen or any other guard who was bent on sexual assault. But detection and prevention is a little bit different in this language in Bryan County. You know, the high degree of predictability may also support an inference of causation, you know, that the municipality's indifference led directly to the very consequence that was so predictable. That seems far more possible in the detection prevention category than in the failure to supervise. Yes, Judge Barrett, I agree that the failure to detect and prevent doesn't rely on Christensen or any evaluation of what he would have done in a different situation. I do think that there's evidence in the record that Christensen admitted that, as I was starting to say earlier, admitted that he knew it was against the law, but he didn't believe what he was doing was torturing these women. And so had there been training that taught male guards about why this is a flat prescription because women in this situation are often abused, because there's an inherent power disparity, that that sort of thing, I think a jury could have determined he did this wrong thing, this despicable thing, and we want to hold him accountable. But also, had he been properly trained, he may not have engaged in that behavior. But I agree with you that this court doesn't need to make that determination because the determination that additional training on prevention and detection could have, would have led to these sexual assaults, which again, occurred over 100 times, being uncovered and stopped. Ms. Grady, I thought one of the points that you've made in your brief, and I'm mindful of in your colloquy here, is that, am I correct, that one of the reasons you thought a highly predictable consequence that'd be in a sexual assault would occur was because the evidence showed, in keeping with the first question Judge Wood asked this morning, that in the wake of the Jorgensen incident, the county did nothing institutionally, literally nothing. Am I right about that, as a matter of record evidence? That's right, Judge Scudder. There is no, the evidence is clear that nothing was done. There was no meeting called to say, we have a zero-tolerance policy? No, Your Honor. Was there any training session held? No, in fact, Schaefer... Was there any discussion with inmates that if you feel uncomfortable, if you see something, or something happens, here's how to report it? Did anything like that happen? No, Your Honor. Absolutely nothing happened. And so, going to the point about what inferences are fair, might the jury have concluded that a highly predictable consequence of doing nothing was that a sexual assault could occur within the facility? I think that that was the most likely inference, and the jury was certainly entitled to reach that. And to the extent that the county contends that it was not foreseeable to the county, then that was an argument that was available to them, and that it did make closing arguments. This is a case that is, the quintessential case we leave to the jury here. There are disputes of fact, but frankly, on one score, that is the total lack of response, the facts are all but disputed. Katie, on the training question, what's the rule you were going to ask of this court to give to Illinois, Wisconsin, and Indiana that tells the jails that their training is constitutional? So how much training is enough for a court to decide that a no-assault policy is constitutional? Well, I think the rule that this court should devise is what almost all of the counties in the country are doing is constitutional, because almost all of the counties and the jails and prisons in the country are implementing measures to prevent and detect sexual assaults. So Wisconsin doesn't require PREA. Are you saying we should require PREA? Absolutely not, Your Honor. The question is not whether the jail is required to implement or adopt PREA. The question is when the jail is put on actual direct notice of a problem with predatory behavior by its male guards against female detainees, and an example that a guard has stepped over the line from that verbal predatory behavior and committed multiple sexual assaults, that it has to do something. Now, you're talking about the Jorgensen N.S. evidence, right? Yes, Your Honor. The touching that you're talking about is of Jorgensen, of her backside, correct? Well, there are multiple instances in which N.S. was sexually assaulted through inappropriate touching on her buttocks. And there's also evidence at Exhibit 31 that there was other touching that was obviously inappropriate. And although that is not intercourse, it is within the four corners of what the Wisconsin statute allows. And so there's no reason that that would not have made the county aware that it had to do something, and it could have done anything. And eyes are testified about a number of different options that it could have done. And had it done any one of those, this may well be, we may well not be here because there'd be a defense verdict. But why didn't, why did he say they had a good record including the Jorgensen evidence? What he said was that. Jail, he's talking about the jail. Yes, so he was asked about the jail's record and what he said was on its face. And I believe that evidence, I believe what he was alluding to is that the point of secure reporting mechanism is that you allow people to actually tell you about sexual assaults that are occurring. And so I see my time has expired. I'd ask that this court affirm the jury verdict. Thank you, your honors. Thank you very much. Mr. Cranley. Thank you, your honor. The suggestion that the plaintiffs would have reported this had there been an anonymous reporting mechanism holds no water. They were in and out of the jail 10 different times. They met with doctors, their lawyers, their parole agents, their therapists. They never told anybody about it. So whether it was anonymous in the jail or outside the jail, there's no evidence that that would have had any causal effect in this case. What the plaintiffs were required to prove was that the county was on notice of a particular deficiency in its policies or training and it made a conscious choice not to enact that particular policy or training. There was no specifics in this case provided by Mr. Iser about what particular policies or training were missing. He said prevention and detection. He gave us nothing more than that. He had a lot more in his expert report, right? There was much, much more detail was if anybody had wanted to press him on that. He had actually laid out a lot more detail in both his expert report. His expert report is not in evidence at this trial. But you could have asked him if you thought his evidence was not sufficiently detailed, but it was too vague to say there's no policy about prevention or detection and what could we possibly have done. That was a line of inquiry available, right? Sure, but it's the plaintiff's obligation to come forward with that evidence. Let me just say that I think you would have been making a different argument if he had said do number one, number two, number three, and number four, just as you're saying, well, you know, Wisconsin doesn't have to implement PREA, which of course it doesn't. But he was indicating examples of things that were feasible. This was not something that was just off in the realm of the impossible. And that's all. Most of the things that he suggested were, in fact, being done by Polk County. He just didn't like the way they were being done. Bigger font, et cetera. All right. Well, thank you very much. Thanks to all counsel. The court will take this case under advisement and we will be in recess.